UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN BUILDING AND
CONSTRUCTION TRADES COUNCIL,
AFL-CIO, and GENESEE, LAPEER,
SHIAWASSEE BUILDING AND
CONSTRUCTION TRADES COUNCIL,
AFL-CIO,

    Plaintiffs,

v.

RICHARD SNYDER, Governor of the State of
Michigan, in his official capacity,

    Defendant.
_____/

CASE NUMBER: 12-13567

HON. VICTORIA A. ROBERTS

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**I. INTRODUCTION**

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction pursuant to Fed. R. Civ. P. 65. (Doc. 4). Plaintiffs seek to enjoin the enforcement of Michigan Public Act 238 of 2012, MCL §408.871 *et seq.*

The Court **GRANTS** Plaintiffs' Motion.

**II. BACKGROUND**

On July 19, 2011, Governor Snyder ("Defendant") signed the Michigan Fair and Open Competition In Government Construction Act ("2011 Act"), MCL § 408.871 *et seq.,* which controlled the types of terms that the State of Michigan ("State") or other governmental units, such as cities, towns, counties, school districts, and others, may

1

use in contracts for the construction, repair, or remodeling of government facilities.

Plaintiffs are unincorporated associations composed of labor organizations; construction employees are their members.

In *Michigan. Bldg. And Const. Trades Council, AFL-CIO v. Snyder*, 846 F. Supp. 2d 766 (E.D. Mich. 2012) ("*Snyder I*"), the same Plaintiffs challenged the 2011 Act. In its February 29, 2012 order granting summary judgment to Plaintiffs, this Court permanently enjoined the 2011 Act, agreeing with Plaintiffs that it was regulatory and preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 517, because it effectively banned labor agreements on all government construction projects. *Id.* Defendants appealed the *Snyder I* decision. This Court denied Defendant's petition for a stay pending appeal; *Snyder I* is on appeal in the Sixth Circuit.

In response to the Court's ruling in *Snyder I*, on June 26, 2012 Defendant signed Public Act 238 of 2012 ("2012 Act"), MCL § 408.871 *et seq.* into law. It amends the 2011 Act and took effect on June 29, 2012. Plaintiffs challenge the 2012 Act on the grounds that -- like the 2011 Act--it is preempted by the NLRA and that it violates their rights under the NLRA. Central to the Plaintiffs' challenge is -- again -- the effect the 2012 Act has on project labor agreements or "PLAs."

**1. Project Labor Agreements (PLAs)**

A PLA is a "pre-hire agreement between a construction project owner and a union or unions that a contractor must agree to before accepting work on the project and that establishes the terms and conditions of employment for the project." *Johnson v. Rancho Santiago Comm. College Dist.*, 623 F.3d 1011, 1017 n. 1 (9th Cir. 2010). A PLA sets the terms and conditions of employment for all contractors, subcontractors,

and all construction workers who will operate at a job site for the duration of the project. 846 F. Supp. 2d at 771. A PLA often includes terms such as no-strike clauses, grievance procedures, and resolution of jurisdictional disputes. *Id.* In *Snyder I*, this Court recognized that a PLA would not be effective if it did not bind the contractors and subcontractors. *Id.* at 780. Often, a project's bid specifications require all contractors and subcontractors to agree to the terms of the PLAs. *Id.* at 772.

A PLA can come into effect in different ways. First, "a union building trades council (such as one of the Plaintiffs here) negotiates and enters into a PLA covering a particular project with a construction manager, who acts as agent to the owner. Then, the owner incorporates a requirement into the bid specifications that successful bidders agree to adhere to or enter into the PLA." *Id.* Second, "a trade council could negotiate a PLA directly with an owner, who subsequently incorporates the PLA requirement into the bidding specifications." *Id.* Third, "a public entity may directly negotiate a PLA with trades councils covering a series of projects over a fixed time period." *Id.* Finally, "a general contractor may independently negotiate a PLA with trades councils either before or after being awarded the work." *Id.*

**2. The 2012 Act**

Both parties direct the Court to the following sections:

(A) Section 5. The Court found this section in the 2011 Act in *Snyder I* to be the key operative provision of the 2011 Act. It read:

> A governmental unit shall not enter into or expend funds under a contract for the construction, repair, remodeling, or demolition of a facility if the contract or subcontract under the contract contains any of the following:
>
> (a) A term that requires, prohibits, encourages, or discourages bidders,

> contractors, or subcontractors from entering into or adhering to agreements with a collective bargaining organization relating to the construction project or other related construction projects.
>
> (b) A term that discriminates against bidders, contractors, or subcontractors based on the status as a party or nonparty to, or the willingness or refusal to enter into, an agreement with a collective bargaining organization relating to the construction project or other related construction projects.

*See id.* at 771 (citing the 2011 Act, M.C.L. § 408.875). The 2012 Act removes the restriction on the use of PLAs by private actors, but precludes the State and governmental units from requiring or prohibiting their contractors and subcontractors to adhere to an agreement with a labor organization. *See* M.C.L. § 408.875. In relevant part, Section 5 of the 2012 Act states that:

> [A] governmental unit awarding a [construction] contract . . . shall not, in any bid specifications, project agreements, or other controlling documents:
>
> (a) Require or prohibit a bidder, offeror, contractor, or subcontractor from entering into or adhering to an agreement with 1 or more labor organizations in regard to that project or a related construction project.
>
> (b) Otherwise discriminate against a bidder, offeror, contractor, or subcontractor for becoming or remaining or refusing to become or remain a signatory to, or for adhering or refusing to adhere to, an agreement with 1 or more labor organizations in regard to that project or a related construction project.

*Id.*

      (B) Section 7. Like its predecessor in the 2011 Act, it prohibits the State and all governmental units from awarding a grant, tax abatement, or tax credit conditioned upon a requirement that an awardee include a term described in Section 5. *Id.* § 408.877.

      (C) Section 8 states, in relevant part, that the 2012 Act does not prohibit a

governmental unit from awarding a contract, grant, tax abatement, or tax credit to those who enter into an agreement with a labor organization, "if being or becoming a party or adhering to an agreement with a labor organization is not a condition for award of the contract . . . and if the governmental unit does not discriminate . . . based upon the status as being or becoming, or the willingness or refusal to become, a party to an agreement with a labor organization." *Id.* § 408.878. Section 8 also states that the 2012 Act does not prohibit a contractor or subcontractor from voluntarily entering into agreements with a labor organization related to a contract with a governmental unit or one that is funded by a grant, tax abatement, or tax credit. *Id.*

(D) Section 9 now exempts a particular project, contract, subcontract, grant, tax abatement, or tax credit from the requirements in Sections 5 and 7 if the governmental unit finds special circumstances that require an exemption to prevent an imminent threat to public health or safety, but such finding "shall not be based on the possibility or presence of a labor dispute concerning the use of contractors or subcontractors who are nonsignatories to, or otherwise do not adhere to, agreements with 1 or more labor organizations, or concerning employees on the project who are not members of or affiliated with a labor organization." *Id.* § 408.879.

(E) Section 13 continues to act as a savings clause. While Section 13 in the 2011 Act dictated that it shall be construed so as not to interfere with labor relations of parties that are protected under the NLRA, Section 13 of the 2012 Act now mandates that it should be interpreted so as not to interfere with labor relations of parties *left unregulated* under the NLRA. *Id.* § 408.883.

(F) Section 2 adds a statement of purpose:

5

> The legislature intends this act to provide for more economical, nondiscriminatory, neutral, and efficient procurement of construction-related goods and services by this state and political subdivisions of this state as market participants, and providing for fair and open competition best effectuates this intent.

*Id.* § 408.872.

### 3. The NLRA

Section 7 of the NLRA protects employees' right to collective bargaining:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

29 U.S.C. § 157. An employee's right to negotiate and secure a PLA is a form of concerted activity protected under Section 7. *Snyder I*, 846 F. Supp. 2d at 779. Furthermore, Section 8 of the NLRA allows for PLAs in the construction industry. *Id.* at 779-80.

## III. LEGAL STANDARD

Under Fed. R. Civ. P. 65(a), a court may issue a preliminary injunction on notice to the adverse party. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *United States v. Edward & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) ("The purpose of a preliminary injunction is simply to preserve the status quo."). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. The movant need not prove its case in

full at a preliminary injunction hearing, and the findings of fact and conclusions of law made at this stage are not binding at trial on the merits. *Id.*

When a party moves for preliminary injunction, district courts consider four factors to determine whether to grant relief: (1) the likelihood of success on the merits; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4) the impact on the public interest. *Christian Schmidt Brewing Co. v. G. Heilman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985). No single factor is dispositive; rather, the court must balance them and determine if they weigh in favor of an injunction. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

**IV.    ANALYSIS**

**1. Plaintiffs Are Likely to Succeed on the Merits**

Plaintiffs say that despite the amendments, the 2012 Act is invalid and unenforceable because it continues to prohibit governmental units from (1) including PLAs in their bid specifications and contracts for public work construction projects; (2) using PLAs on their projects; and (3) requiring the recipients of grants, tax abatement or tax credits to use PLAs. Specifically, Plaintiffs argue that the NLRA preempts the 2012 Act because it interferes with the right that Section 7 of the NLRA confers on employees to engage in concerted activity for the purpose of convincing governmental units to enter into PLAs. Plaintiffs also argue that the 2012 Act is regulatory because it is an across-the-board ban on the inclusion of PLAs in government construction contracts and because --despite the 2012 Act's explicit intent as stated in Section 2--the State is not acting as a market participant.

Defendant argues that the NLRA does not preempt the 2012 Act because the NLRA does not protect the right of private sector unions to negotiate PLAs with political subdivisions that are themselves excluded from the coverage of the NLRA. In addition, Defendant argues that the 2012 Act is not regulatory because it is narrowly tailored to affect only those projects where the government is the owner and does not seek to regulate or influence private entities. Defendant says the 2012 Act demonstrates the State's interest in procuring high-quality, low-cost construction services in a neutral way, and that the 2012 Act reflects a business decision to administer projects more efficiently as market participants do.

In addressing the likelihood of success on the merits, the Court considers if the 2012 Act is preempted by the NLRA and whether it amounts to regulation, or if it authorizes permissible proprietary conduct by the State. *See Snyder I*, 846 F. Supp. 2d at 779-90.

### A. The 2012 Act is preempted by the NLRA

The NLRA preempts the 2012 Act under the *Garmon* and *Machinist* doctrines.

Pursuant to *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959) ("*Garmon*"), state and local units of government may not regulate activities that are "protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8." *Id* at 244; *Snyder I*, 846 F. Supp. 2d at 782. The ability to negotiate and enter into PLAs is a form of concerted activity protected under Section 7 of the NLRA, and Section 8 of the NLRA explicitly authorizes construction industry employees to enter into PLAs. Section 5 of the 2012 Act continues to prohibit any governmental unit or construction manager acting on its behalf from requiring their contractors to

agree to adhere to a PLA as a condition of contract award. This prohibition effectively constricts the right of employees to negotiate and enter into PLAs. A PLA, to be effective, requires all contractors or subcontractors to agree to its terms. *Snyder I*, 846 F. Supp. 2d at 780. Therefore, workers' exercise of their right to engage in concerted activity under the NLRA --to convince State or governmental units to enter into PLAs-- would be futile if the State or governmental units cannot condition construction awards on a promise to adhere to a PLA, or if contractors or subcontractors are not required to adhere to a PLA.

Defendant argues that the 2012 Act is not preempted because the NLRA does not create rights enforceable against governmental units, an argument also advanced in defense of the 2011 Act. Defendant's argument is unavailing. The Supreme Court stated -- and this Court recognized -- that "[t]he NLRA . . . creates rights in labor and management both against one another and against the State." *Golden State Transit Corp v. City of Los Angeles*, 493 U.S. 103, 109 (1989); *Snyder I*, 846 F. Supp. 2d at 782. Although the State is excluded from the definition of "employer" under the NLRA, in passing Section 8 of the NLRA, Congress intended to preclude states from regulating PLAs in the construction industry. *Snyder I*, 846 F. Supp. 2d at 783. The 2012 Act is, therefore, preempted under *Garmon*; it effectively limits activity protected by the NLRA: the right of construction industry workers to bargain for PLAs on State construction projects.

Pursuant to *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Empl. Relations Comm'n*, 427 U.S. 132, 140 (1976) ("*Machinists*"), state and local governmental units are prohibited from regulating areas which Congress

intended to be left "unregulated and to be controlled by the free play of economic forces." *Id.* at 140; *Snyder I*, 846 F. Supp. 2d at 783. The most important question for *Machinists* preemption, is whether Congress intended that the conduct involved be unregulated and controlled by the free play of economic forces. *Snyder I*, 846 F. Supp. 2d at 783. Congress' intent to leave construction industry PLAs to the operation of economic forces is evident in its enactment of amendments to Section 8 of the NLRA, which addressed construction industry PLAs directly and set a different balance of power for bargaining within that industry. *Id.* at 783-84. Legislation on activity that upsets this balance of power is preempted under *Machinists*. *Id.* at 784.

The 2012 Act upsets the balance of power Congress established in the construction industry; its effect is to inhibit the right of construction industry workers to enter into effective PLAs with the State and its subdivisions despite Congress' intent for PLAs to be permissible.

Defendant says that there can be no *Machinist* preemption because governments, like private parties, may decide not to enter into PLAs. This argument is unavailing; the 2012 Act, in fact, precludes the State and its subdivisions from exercising discretion in determining whether entering into a particular PLA would be in their best interest on a given project. Such a PLA would be effective, in part, because it would require contractor and subcontractor adherence. "[D]enying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists*." *Bldg. and Const. Trades Council of the Metro. Dist. v. Associated Bldrs. and Contractors of Mass./R.I. Inc.*, 507 U.S. 218, 232 (1993) ("*Boston Harbor*").

Thus, given that the 2012 Act upsets the balance of power that Congress set in motion concerning the use of PLAs in the construction industry, it conflicts with the NLRA and is subject to *Machinists* preemption.

Although Section 13 states that the 2012 Act should be interpreted so as not to interfere with the labor relations of entities left unregulated under the NLRA., this does not preclude its preemption. Given the restrictions in Sections 5 and 7, there is no way to give meaning to Section 13 without nullifying the entire 2012 Act. Furthermore, even though Section 8 allows for the possibility that contracts could be awarded to parties that have entered into PLAs, it is still subject to the limitations in Sections 5 and 7.

The exceptions in Section 9, for certain situations where public health and safety is threatened, are minimal and do not impact the constrictions of Sections 5 and 7. Indeed, every section of the 2012 Act inhibits the right of union members to engage in concerted activity with the State and its subdivisions.

### B. The 2012 Act is tantamount to regulation.

While regulation is subject to NLRA preemption, "proprietary" conduct is not. *Snyder I*, 846 F. Supp. 2d at 785. A state engages in proprietary conduct when it seeks to serve its own needs by functioning as a market participant *Id.* at 785-86.

To determine whether state action amounts to market participation a court must consider: (1) whether the action furthers a state's interest in efficient procurement of goods or services, or addresses conduct unrelated to that interest; and (2) whether the action seeks to set a broad policy in the state, or is sufficiently narrow to foreclose that inference. *Id.* at 786.

The 2012 Act is not narrowly tailored. At first glance, the 2012 Act's broad scope

raises an inference of policy-making because it covers all public works projects by the State or its subdivisions without geographic, temporal, or other restraints except those related to threats to public health and safety. The second prong in the market participation test -- whether state action is narrowly tailored -- is satisfied by "narrow spending decisions[, which] tend to be expressly limited in time and scope -- for example, they apply to one city contract or to a number of contracts of a particular size and funded by a particular finite source." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 398, 399 (9th Cir. 2011); *Snyder I*, 846 F. Supp. 2d at 787.

The 2012 Act has broad scope and lacks geographic or temporal limitations which would preclude an inference that its main purpose is to implement and regulate labor law; the Court believes that the minimal exceptions related to threats to public health and safety are not significant for this analysis. *See Snyder I*, 846 F. Supp. at 789.

The 2012 Act does not reflect the State's interest in efficient procurement of goods or services. Satisfaction of the first prong of the market participation test depends on whether "the challenged action essentially [reflects] the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances." *Id.* at 789 (internal quotation marks omitted).

Defendant directs the Court to *Bldg. and Constr. Trades Dept., AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) ("*Allbaugh*"). While this Court in *Snyder I* held that *Allbaugh* was of questionable authority and need not be followed, the Court did recognize that it was instructive to compare the language in the executive order in

*Allbaugh* to the ambiguous preamble in the 2011 Act. 846 F. Supp. 2d at 787-89. The stated purpose of the executive order at issue in *Allbaugh* was to promote "the economical, nondiscriminatory, and efficient administration and completion of Federal and federally-funded or assisted projects." *Id.* at 789 (internal quotation marks omitted) (citing 66 Fed. Reg. at 11,225).

Although Section 2 purports to mimic the executive order in *Allbaugh* and explicitly reflect the Legislature's intent to provide for more economical, nondiscriminatory, neutral, and efficient procurement of construction-related goods and services, the 2012 Act still does not satisfy the first prong of the market participation analysis; the State is not acting in the usual manner that private parties would under similar circumstances. *See id.* at 790. The 2012 Act continues to be a statement of blanket policy that is not the action of a typical proprietor. The Supreme Court in *Boston Harbor* recognized that taking a stand for or against something, merely on principle, is not rationally motivated by economic concerns and therefore not typical of private actors in the marketplace. 507 U.S. at 229. The Court believes that the State is likely attempting to implement and affect labor policy.

For these reasons, the 2012 Act is regulatory and subject to NLRA preemption. Plaintiffs' claim demonstrates a likelihood of success.

**2. Plaintiffs Will Suffer Irreparable Harm If The Injunction Is Not Granted**

Plaintiffs argue that unless the 2012 Act is enjoined they will be precluded from attempting to convince the State and its subsidiaries to use PLAs on their constructions projects; they say that several entities subject to the 2012 Act have already informed Plaintiffs that they will not enter into PLAs because of the prohibitions of the 2012 Act.

Plaintiffs direct the Court to case law which holds that state interference with federal rights created by federal labor statutes leads to irreparable harm. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938-39 (9th Cir. 1987); *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906 (3d Cir. 1981).

Plaintiffs demonstrate they will suffer irreparable harm in the absence of an injunction.

### 3. Substantial Harm to Others

"[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).

Given Plaintiffs' likelihood of success on the merits, the Court believes that others will not suffer substantial harm if the injunction is granted.

### 4. The Public Interest

The public interest "lies in a correct application of the federal constitutional and statutory provisions upon which the claimants have brought this claim." *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

Given the likelihood that the 2012 Act is preempted by the NLRA, the public interest favors the issuance of an injunction to prevent interference with rights afforded by the NLRA.

### V. CONCLUSION

Plaintiffs' Motion for Preliminary Injunction is **GRANTED**.

**IT IS ORDERED.**

              <u>S/Victoria A. Roberts</u>
              Victoria A. Roberts
              United States District Judge

Dated: November 15, 2012

---

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on November 15, 2012.

<u>S/Linda Vertriest</u>
Deputy Clerk

---